UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

TEALLA R.,

    Plaintiff,

           v.

ANDREW SAUL,
Commissioner of the Social
Security Administration,

    Defendant.

Case No. 2:18-cv-000134

## OPINION AND ORDER

Plaintiff Tealla R. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act requesting review of the Commissioner's decision to deny her application for Title II disability insurance benefits (DIB) and supplemental security income (SSI) benefits. Now before the Court is Plaintiff's motion for judgment reversing the decision of the Commissioner, and the Commissioner's motion for judgment affirming the same. For the reasons set forth below, Plaintiff's motion is **granted**, the Commissioner's motion is **denied**, and the matter is **remanded** for a reevaluation of the evidence.

**BACKGROUND**

I.  **PROCEDURAL HISTORY**

On April 11, 2016, Tealla R. filed applications for DIB and SSI benefits, alleging an onset date of November 1, 2015. After a video hearing held on July 19, 2017, Judge Edward Malvey, the Administrative Law Judge (ALJ) presiding over her case, issued an unfavorable decision on August 16, 2017. On July 10, 2018, the Appeals Council denied Ms. R.'s request for review. Plaintiff timely filed this action appealing the ALJ's denial of benefits.

II. **PERSONAL AND MEDICAL HISTORY**

Tealla R. was forty-five years old on her alleged disability onset date of November 1, 2015. **AR 39.** From 1996 to 2015, she held consistent employment. **AR 217.** Over the past fifteen years she has held several jobs, including as a marker/booker, a bank teller, a cashier at Home Depot, and, from 2013 to 2014, as a hospice caregiver. **AR 40-43.** In 2015, Ms. R. worked her last job at Columbia Forest Products, during which her main duties involved piling wood. **AR 43.**

Ms. R. testified to having longstanding struggles with pain throughout her body, including her hands, shoulders, elbows, knees, hips, ankles, and feet. **AR 45, 48.** The pain began after a vehicular assault that Ms. R. survived at age sixteen. **AR 344.** Ms. R. was first diagnosed with fibromyalgia syndrome in the

1990s by her primary care physician of over twenty years, Dr. Philip G. Kiely, M.D. **AR 344.** While she had been managing the pain while working for many years, the pain increased in the two and a half to three years before her 2017 hearing. **AR 48.**

On November 5, 2015, Ms. R. reported to Dr. Kiely with symptoms of a fibromyalgia flare up which had resulted in her losing her job due to excessive absenteeism. **AR 308.** Dr. Kiely prescribed her gabapentin to manage the pain. **AR 308.** On February 17, 2016, Ms. R. returned to Dr. Kiely with reports of improved pain with the gabapentin but new complaints of anxiety. **AR 306-307.** Dr. Kiely gave Ms. R. a diagnosis of depression with anxiety and prescribed her citalopram hydrobromide. However, on May 17, 2016, Ms. R. returned with complaints of fatigue, aches, and skin sensitivity despite the gabapentin usage. **AR 333.** She also reported weight gain and a Body Mass Index (BMI) of 32.87. **AR 333.** Dr. Kiely wrote in his treatment notes that he thought she was currently disabled, and that he had filled out some forms to that effect. **AR 334.** Dr. Kiely also increased Ms. R.'s dosage of gabapentin, prescribed Cymbalta for her anxiety and depression, and ordered numerous laboratory tests. **AR 334.**

On June 2, 2016, Ms. R. was examined by Dr. Fred Rossman, M.D. from Vermont Disability Determination Services (VDDS). **AR 321.** In his assessment, Dr. Rossman observed that Ms. R. "expresse[d] pain with palpation to 10 out of 18 fibromyalgia

3

points affecting the neck anteriorly and posteriorly and the upper chest and upper back for a total of 10 out of 19 fibromyalgia points." **AR 324.** He noted that she "enters this office in no acute distress . . . She is able to remain seated during the entire interview." **AR 324.** He also noted that Ms. R.'s grip strength was 5/5 and she was able to touch her thumb to four fingers. **AR 324.**

On June 23, 2016, Ms. R. went to see psychologist J.P. Hayden as a part of a VDDS referral and evaluation. **AR 326.** Ms. R. explained that she was hit by a car at age 15, after which she was hospitalized and unable to walk for 6-8 months. **AR 327.** Ms. R. stated that she had sustained nerve damage in her hip, as well as a pelvic fracture, neck pain, rib damage, multiple surgeries for ectopic pregnancies, tubal ligation, and burning of the uterus, all as a result of the accident. **AR 327.** Further, Ms. R. reported that Dr. Kiely had diagnosed her with depression in 2006 and with anxiety in 2014 after the death of her sister in a freak accident. **AR 327.** Ms. Hayden observed that Ms. R. was well-groomed, polite, and cooperative during the appointment, and appeared to sit, stand, and walk with normal gait with "no overt evidence of pain." **AR 328.** She noted, however, that Ms. R.'s "mood was depressed," and offered diagnoses of moderate depression, anxiety, and panic attacks. **AR 328-330.**

On September 22, 2016, Ms. R. began seeing psychologist Judy D. Young, M.A. for her depression. At the appointment, Ms. R. reported difficulty sleeping due to pain related to her fibromyalgia, as well as stress, headaches, daily sadness and tearfulness, anxiety, memory issues, and anger. **AR 363.** Ms. Young diagnosed Plaintiff with other specified depressive disorder and bereavement. **AR 364.** Ms. Young saw Ms. R. in therapy a total of five times between September and December 1, 2016. **AR 362-72.** She raised the possibility that Ms. R. may have ADHD and contacted Dr. Kiely about possibly prescribing appropriate medication. **AR 362-72.**

On October 16, 2016, Dr. Kiely wrote a letter opining that Ms. R. "is totally and permanently disabled from all work including sedentary work." He noted that, despite her "very strong work ethic," Ms. R. had been debilitated by worsening fibromyalgia, which caused her widespread pain, fatigue, depression, anxiety, and cognitive difficulties. He wrote that she could not do "even sedentary work" due to hand pain, cognitive problems, widespread axial and limb pain, fatigue, and depression / anxiety. **AR 343-45.**

On December 12, 2016, Ms. R. returned to see Dr. Kiely with complaints of ongoing pain despite being on the maximum dosage of gabapentin. Dr. Kiely began prescribing Lyrica. **AR 349-50.** On December 13, 2016, Plaintiff went to see rheumatologist Dr. Chi

5

Chi Lau, M.D. Dr. Lau noted Ms. R.'s "longstanding history of fibromyalgia" and its unresponsiveness to multiple medications and interventions. **AR 357.** Dr. Lau further observed 18 out of 18 tender points bilaterally upon examination and noted her reports of poor sleep, fatigue, morning stiffness, and chronic joint and hand pain. **AR 357-58.** Dr. Lau advised that she try the Lyrica as prescribed by Dr. Kiely and also that she consider water therapy and/or physical therapy. **AR 357-58.**

On June 9, 2017, Ms. R. went to see physical therapist Bill Hogan, M.S. Mr. Hogan found that Ms. R. had six conditions with deficits, including fibromyalgia, and that her hip, knee, cervical spine, thoracic spine, lumbar spine, gait disturbance, and balance disturbance were all dysfunctional. **AR 387-406.** Ms. R. noted difficulty sitting and standing for a half hour, walking for 100 yards, doing personal care, housework, and lifting groceries from the floor. **AR 387-406.** Ms. R. participated in five aqua therapy sessions during June and July of 2017. **AR 387-406.**

Ms. R. saw Dr. Kiely again on June 13, 2017 with complaints of sternal pain radiating around to her back. **AR 419**. She reported benefits from pool therapy. **AR 419**. Dr. Kiely also noted, however, that due to her chronic pain and fatigue, Plaintiff was unlikely to be able to hold any form of employment "due to work absences even in [a] sedentary job." **AR 419.** On

6

June 23, 2017, Dr. Kiely wrote another letter to this effect, opining that Ms. R. "is totally permanently disabled from all work due to fibromyalgia." **AR 386.**

   **III. THE ALJ'S DECISION**

   A. Overview of the Five-Step Sequential Evaluation Process

   The Social Security regulations provide a five-step sequential process for evaluating disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

   If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's RFC, which means the most the claimant can still do despite his or her mental and physical

limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f).

Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

B. The ALJ's Analysis of Ms. R.'s Case

In this case, the ALJ first found that Ms. R. had not engaged in substantial gainful activity since November 1, 2015, the date of her application. **AR 17.** At step two, the ALJ concluded that Ms. R. has the following severe impairments: fibromyalgia, obesity, affective disorder, and anxiety. **AR 17.**

At step three, the ALJ concluded that Ms. R.'s severe impairments did not meet or medically equal a listed impairment

8

set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. **AR 17.** First, the ALJ concluded that the claimant's mental impairments did not meet the criteria of Listings 12.04 and 12.06. **AR 18.** He found that the claimant had moderate limitations with respect to understanding, remembering, and applying information, citing her ability to prepare meals, pay bills, shop, drive, and take medications. **AR 18.** The ALJ also cited the opinion of J.P. Hayden, Licensed Psychologist-Master, attesting that Ms. R.'s memory appeared to be intact. As to interacting with others, the ALJ found that Ms. R. has moderate limitations. **AR 18.** While acknowledging Ms. R.'s submission that she has difficulty engaging in social activities, dealing with authority, and spending time in crowds, the ALJ pointed to her ability to shop, spend time with her family, interact congenially with medical professionals, and live with her husband as evidence weighing against a finding of extreme limitation. **AR 18.**

With regard to Ms. R.'s ability to concentrate, persist, or maintain pace, the ALJ also found moderate limitations based on her ability to drive, prepare meals, watch television, and manage funds. **AR 19.** Finally, the ALJ found that Ms. R. has mild limitations in her ability to adapt and manage herself. The ALJ noted that, despite Ms. R.'s attestations of difficulty in handling change, feeling able to dress, and managing her mood, the record reflects her ability to care for animals and to

9

generally display appropriate grooming and pleasant comportment with others.

Additionally, ALJ Malvey considered Plaintiff's fibromyalgia diagnosis based on the guidance of Social Security Ruling 12-2p. **AR 18.** Based on his weighing and evaluation of the record medical opinion evidence, ALJ Malvey concluded that Ms. R.'s fibromyalgia symptoms, while serious, did not appear to hinder her ability to function in public, walk, interact with others, and focus, and was consistent with some capacity to work. **AR 22-23.**

In assessing Ms. R.'s condition, the ALJ gave some weight to the opinion of Dr. Kiely, the claimant's treating physician. ALJ Malvey did not give controlling weight to Dr. Kiely's opinion despite his longitudinal understanding of Plaintiff's condition based on his assessment that Dr. Kiely's opinion was not fully consistent with or supported by the objective medical evidence of record, including his own treatment notes "that indicate that the claimant has benefited from both medications and pool therapy" and that do not "indicate that the claimant is in acute distress upon examination." **AR 24.** ALJ Malvey also concluded that Dr. Kiely's opinion was not consistent with the findings of Dr. Rossman, "who indicated that while the claimant did have eighteen fibromyalgia tender points, . . . she had

normal hand strength, could ambulate normally, was able to sit through the examination, and was in no acute distress." **AR 24.**

The ALJ also gave some weight to the findings of state agency consultants Dr. Knisely and Dr. White "who opined that the claimant is capable of performing medium exertional work." **AR 24.** ALJ Malvey only gave their opinions some weight based on his assessment that their opinions were not entirely consistent with the objective medical evidence of record, and due to the fact that they did not examine Plaintiff herself or review the additional medical evidence at the time of the hearing. **AR 24.**

ALJ Malvey gave strong weight to the opinions of Dr. Goldberg and Dr. Atkins "who opined that the claimant could sustain concentration, persistence, and pace over two hour periods over a typical work day and work week for simple one to three step tasks in a low production setting." **AR 24.** Although Drs. Goldberg and Atkins did not examine Ms. R., the ALJ gave strong weight to their opinions based on his view that "they are supported by and consistent with the objective medical evidence, including the examinations of the claimant's psychologist and the consultative examiner, Mr. Hayden and the claimant's conservative treatment of her condition." **AR 24.**

Based on this evidence, the ALJ concluded that Ms. R. has the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she is limited to

11

performing one to three step instructions, but not at production rate pace. **AR 19.** The ALJ also found that Plaintiff is limited to occasional interaction with supervisors, coworkers, and the public, and is limited to occasional simple task changes. **AR 19-20.**

At step four, the ALJ considered Ms. R.'s past relevant work as a lumber grader, cashier, personal care attendant, and bank teller, and concluded that she is unable to perform this work in light of her RFC. **AR 25.** Finally, at step five the ALJ found that there are jobs that exist in significant numbers in the national economy that the claimant can perform. **AR 25-26.** Based on this analysis, ALJ Malvey concluded that Ms. R. has not been under a disability as defined in the Social Security Act from November 1, 2015 through the date of his decision. **AR 26,**

## STANDARD OF REVIEW

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that her "impairments are of such severity that [s]he is not only unable to do [her] previous work[,] but cannot, considering [her] age, education,

and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the Court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, a court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## **DISCUSSION**

Tealla R. argues that (1) the ALJ erred in applying the treating source regulation because he did not give controlling weight to treating physician Dr. Kiely's medical opinion, and (2) that the ALJ's residual functional capacity (RFC) finding is not supported by substantial evidence. The Court agrees with

13

Plaintiff's arguments and finds that the ALJ's decision is not supported by substantial evidence.

First, ALJ Malvey improperly weighed the opinion of Dr. Kiely, Ms. R.'s treating physician. According to the treating source rule, a treating physician's medical opinion is entitled to controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 416.927. The factors that must be considered when the treating physician's opinion is not given controlling weight include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir. 2000). The regulations also require the ALJ to provide "good reasons" for not according controlling weight to a treating physician's opinion. *See* 20 C.F.R. § 404.1527(d)(2).

In this case, the ALJ downgraded Dr. Kiely's opinions as not fully consistent with or supported by the medical evidence of record. In both October of 2016 and March of 2017, Dr. Kiely opined that Ms. R. was unable to perform sedentary work due to hand pain, memory function, fatigue, widespread pain,

depression, and anxiety. The ALJ concluded that these observations were unsupported based record evidence that claimant benefited from medication and pool therapy, as well as a lack of evidence that Ms. R. was in "acute distress" upon examination by Dr. Kiely and any of her other healthcare providers. **AR 24.**

Those records, however, are not inconsistent with Dr. Kiely's evaluation of Ms. R.'s debilitating case of fibromyalgia. While Ms. R. had been taking various medication for her pain over the course of her treatment, Dr. Kiely's treatment notes demonstrate that her symptoms continuously intensified nonetheless, even after bouts of short-term pain relief. There is no indication in the record that any of Ms. R.'s medication eradicated her symptoms or struggles, even if they had benefits at various points in her treatment. Likewise, while Dr. Kiely's treatment notes suggest that Ms. R. was enjoying pool therapy, they do not provide any indication that pool therapy markedly reduced her symptoms or functional capabilities.

The ALJ's analysis relies on various treatment notes that observe Ms. R.'s ability to sit through medical appointments without displaying "acute distress," as well as her ability to care for animals, socialize with family, shop in stores, and drive. **AR 23.** For instance, the ALJ points to Dr. Rossman's

findings that Plaintiff had a grip strength of 5/5, the ability to touch her thumb to four fingers, and the ability to ambulate normally upon examination as at odds with Dr. Kiely's evaluation.

However, these observations are not inconsistent with Dr. Kiely's assessment of Ms. R.'s debilitation from fibromyalgia in light of the nature of this ailment. The record reflects that Ms. R. has "good days" and "bad days"; she has repeatedly attested to increasing difficulties and need for assistance to engage in these precise activities to her healthcare professionals. Dr. Kiely's assessment of Ms. R.'s incapacity to perform sedentary work is based not on her complete inability to engage in any one activity or movement, but rather based on the frequency of "bad days" over a longitudinal span. As such, Dr. Kiely's assessments are not unsupported by this record evidence.

Looking to the other "treating source" rule factors, Dr. Kiely had served as Ms. R.'s treating physician for over twenty years, and his assessments of Ms. R.'s conditions have been consistent over time. His findings of fibromyalgia causing widespread pain, fatigue, anxiety, depression, hand pain, and limited functional capacity are also corroborated by psychologist Ms. Young, physical therapist Mr. Hogan, and rheumatologist Dr. Lau. Based on this evidence, the ALJ failed to properly address Dr. Kiely's extensive treatment

relationship, the fact that his opinions were not at odds with other information in the record, or his expertise as a physician. When compared to a review of documents by Dr. Goldberg and Dr. Atkins, Dr. Kiely's ongoing relationship with Ms. R. was more likely to produce an accurate understanding of her capabilities. There is no dispute as to Dr. Kiely's professional qualifications, and the Court finds that the ALJ failed to give his opinions appropriate controlling weight.

The Court therefore finds that the ALJ's conclusions were not supported by substantial evidence. Indeed, the record suggests that Ms. R. is precluded from work based on the testimony of the Vocational Expert. The VE testified that, if an individual missed one day of work per month plus part of a second day, they are precluded from work. Based on Dr. Kiely's June 2017 treatment notes, Ms. R. would miss whole days each week if she were to participate in the work force. Thus, the VE testimony clearly supports a conclusion that Ms. R. is disabled under the Social Security Act, and the Court finds that substantial evidence does not support the ALJ's conclusion.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion to remand is **granted**, the Commissioner's motion to affirm is **denied**, and the case is **remanded** for a reevaluation of the evidence.

DATED at Burlington, in the District of Vermont, this 31st day of March, 2020.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge